**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF SEIZED ELECTRONICS DEVICE AND STORAGE MEDIA KNOWN AS:<br><br>A black Apple iPhone Pro Max with gray case, IMEI: 352852112520679, Telephone Number, (816) 778-5233; and<br><br>A red Apple iPhone 11, IMEI: 352910116703590, Telephone Number (913) 284-4979. | Case No. 21-mj-08267-TJJ |

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

I, Ryan M. Padilla, a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Task Force Officer (TFO) of the Federal Bureau of Investigation (FBI) and have been since January 2021. I am also a sworn Officer with the Lawrence, Kansas Police Department and have been since June 2012. I was promoted to the rank of Detective in March 2018. As a TFO, my duties include the investigation of criminal violations of Title 18 of the United States Code, particularly crimes of violence. During my career, I have developed evidence that was used as probable cause for search warrants and have participated in all aspects of search warrants for violent crime offenses.

2. This Application and Affidavit contains information necessary to support probable cause for this application. It is not intended to include every fact or matter observed by me or known by law enforcement. The information provided is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other law

1

enforcement officials, and my review of records, documents, and other physical evidence obtained during this investigation.

## IDENTIFICATION OF DEVICES TO BE EXAMINED

3.  I have probable cause to believe a search of the above-listed cellular telephones, identified as: 1) a black Apple iPhone Pro Max with a gray case, IMEI: 35285211250679, Telephone Number: (816) 778-5233; and 2) a red Apple iPhone 11, IMEI: 352910116703590, Telephone Number: (913) 284-4979, seized from Davonte L. Chaney's person by law enforcement on September 28, 2021, will lead to evidence, fruits, and instrumentalities related to violations of Title 18, United States Code, Sections 2113(a) and (d) [Bank Robbery] and Title 18, United States Code, Section 924(c)(1)(A)(ii) [Use of a Firearm in Furtherance of a Crime of Violence].

## FACTS SUPPORTING PROBABLE CAUSE

4.  On September 21, 2021, Lawrence, Kansas Police Department officers were dispatched to Truity Credit Union, 2221 W. 31st Street, Lawrence, Douglas County, Kansas in reference to an armed robbery which had just occurred.

5.  Upon arrival, investigators contacted the following employees of the Truity Credit Union, who were in the credit union at the time of the robbery: A.F., C.F., E.C., G.K., and L.E. (identified by their initials). All the employees advised they were standing behind the teller counter when a subject, dressed in all black, walked into the credit union through the east door, pointed a gun at them, and instructed them all to get down on the ground. All the employees complied with the suspect and the suspect asked who had money.

6.  E.C. told the suspect she had cash in her desk drawer, which was across the lobby. The suspect then handed A.F. a white Wal-Mart grocery sack and told A.F. to put the money in the bag. A.F. went over to E.C.'s desk and placed all the money into the grocery sack, along with bait

money with the following serial numbers: MJ00637731A ($20.00), JJ29329861B ($20.00), JL01474882C ($20.00).   A.F. then brought the sack back to the suspect and the suspect instructed her to get back on the ground.

7. The suspect then handed the grocery sack to L.E., who placed all the money from her drawer into the bag.  The suspect then handed the bag to G.K., who placed all his drawer money into the bag, including the bait money. The bait money's serial numbers were identified as: JD13671739D ($20.00), ML16336311B ($20.00), ML16336313B ($20.00).   After gathering the money from the three drawers, for a total of $6,087.35, the suspect left the credit union and was last observed by A.F. and G.K. walking westbound in front of the credit union.

8. Truity Credit Union's accounts are insured by the National Credit Union Administration Board, a U.S. Government Agency.

9. The Truity Credit Union employees described the suspect as a younger (25-30 years of age) black male with an average black skin tone.  The employees advised the suspect was tall (over 6') and had an average build of around 200 pounds.  The employees said the suspect wore a black hooded sweatshirt, with the hood pulled tight (covering his face), and also had a black face mask on.  L.E. advised the suspect wore very distinct speckled colored tennis shoes which had orange on them as well.  G.K. and C.F. also identified the pistol as a black semi-automatic gun which was smaller in size.

10. Investigators later recovered video surveillance from Truity Credit Union and observed the suspect is a taller black male with a large-bridged nose.  The suspect wore an all-black hooded sweatshirt with a white polo emblem on the left breast area.  The suspect had the hood up and pulled tight around his face. The suspect wore a plain black face mask, covering the lower portion of his face. The suspect also wore black and gray jogging pants with a white

unidentified emblem on the thigh area of the left leg.  Investigators noticed a red piece of clothing (sticking out between the sweatshirt and jogging pants), which appeared to be red athletic shorts or pants underneath the jogging pants.  The suspect also had on light-colored gloves.





11. The suspect was also wearing tennis shoes which were black and had a gray/white speckled sole.  The shoes had an orange Nike Swoosh on the top of the shoes and an orange design on the heel of the shoe.  Based on the design of the soles, investigators believed the shoes were Nike Air Foamposites (Safari Print).

12. Investigators reviewed the outside video surveillance from Truity Credit Union, which covered the west entrance and the drive-through lanes.  Investigators noticed that after the suspect walked westbound in front of the credit union, a camera covering the drive-through captured him running southbound (on the credit union's west side).  The suspect continued running towards a path which leads directly into the northeast corner of The Reserve Apartments (hereinafter referred to as "The Reserve"), 2511 W. 31st Street, Lawrence, Douglas County, Kansas.  Truity Credit Union employees closed the blinds of the drive-through after the robbery

and the suspect is no longer observed on camera.

13. Believing the suspect came from the same pathway connecting The Reserve, investigators began reviewing the drive-through video surveillance before the robbery. At approximately 9:06 a.m., a subject (wearing all black) is captured emerging from the northeast corner of The Reserve and walking eastbound through a field behind Truity Credit Union. The subject then turned around and walked back westbound to The Reserve. At approximately 9:08 a.m., investigators believe the same subject (in all black) walked back east in the field from The Reserve and toward the back of Mass Street Beverage and Subway, 3131 Nieder Road, Lawrence, Douglas County, Kansas.

14. At approximately 9:21 a.m., investigators observed the suspect (identified by his clothing) walk from behind Subway to the dumpster area of Casey's, 3111 Nieder Road, Lawrence, Douglas County, Kansas (located on the south side of Casey's). Investigators observed the suspect walk around the dumpster area. At 9:24 a.m., the suspect is captured walking northbound behind Casey's to the north side of the parking lot and out of camera view.

15. At approximately 9:29 a.m., the suspect is observed walking into the parking lot of Truity Credit Union and attempting to open the back door of a white Nissan Rogue in the parking lot.



16. When the suspect cannot make entry into the vehicle, he walked back eastbound to the north corner of Casey's parking lot and leaves out of camera view.

17. At 9:35 a.m., the owner of the white Nissan left the credit union.  At 9:37 a.m., the suspect appeared again on camera, walking westbound toward the west entrance of Truity Credit Union, and eventually entering the credit union.  At 9:39 a.m., investigators observed the suspect exit the credit union and walk northbound around the credit union's front area. Investigators noticed as the suspect exited the credit union, he placed a white grocery sack underneath his hooded sweatshirt.

18. After observing the suspect come from and leave towards The Reserve, LPD Detective Nicholson reviewed video surveillance from The Reserve's entrance.  Detective Nicholson noticed that at approximately 9:03 a.m., a dark gray Pontiac Grand Prix pulled into The Reserve's entrance and traveled eastbound around the roundabout.  From viewing the Truity Credit Union surveillance video, Detective Nicholson noted that the northeast corner of The Reserve was visible and any vehicles driving past could be observed.  Detective Nicholson noted the dark gray Pontiac was not observed traveling south of the northeast corner of the complex.

19. Through backtracking the Pontiac, Detective Nicholson noticed it first appeared on traffic cameras traveling southbound at the intersection of W. 2nd Street and McDonald Drive at approximately 8:27 a.m.  Detective Nicholson used the automated license plate reader, located at the intersection, to discern the vehicle displayed Kansas license plate 171NPE.  Detective Nicholson checked the license plate through Kansas State files and discovered it returned to Davonte Laron Chaney, 3010 N. 76th Street, Kansas City, Kansas, 66109 (registered to a 2004 Pontiac Grand Prix).

20. Detective Nicholson researched Mr. Chaney and located a Douglas County, Kansas mugshot from a 2015 arrest.  Detective Nicholson reviewed the mugshot, the descriptors of Mr. Chaney (a 29-year-old black male, approximately 6'01"/180lbs, with short black hair, brown eyes), and determined Mr. Chaney's physical characteristics were very similar to the Truity Credit Union robbery suspect.  Detective Nicholson contacted Affiant with the information.

21. On September 28, 2021, FBI personnel located the dark gray 2004 Pontiac Grand Prix, bearing Kansas license plate 171 NPE, parked at the residence of 3010 North 76th Street, Kansas City, Kansas.

22. Using law enforcement resources, investigators learned David Laron Chaney (DOB: March 18, 1992) listed 3010 North 76th Street, Kansas City, Kansas as his home address as recent as August 2021.  An unemployment claim, filed by Chaney, listed the home address of 3010 North 76th Street, Kansas City, Kansas, along with previous employment information.  An active "Tax Warrant" associated to Chaney also listed the home address of 3010 North 76th Street, Kansas City, Kansas.

23. On September 28, 2021, investigators observed Chaney leave 3010 North 76th Street, Kansas City, Kansas in the 2004 Pontiac Grand Prix, bearing license plate 171 NPE.  FBI surveillance followed Chaney and confirmed Chaney was the only occupant of the vehicle.  Chaney stopped at a Family Dollar, located at 8049 Leavenworth Road, Kansas City, Kansas and purchased items at the business.  Chaney continued to be the only subject associated with the Pontiac Grand Prix.  Affiant responded to the Family Dollar, located at 8049 Leavenworth Road, Kansas City, Kansas to review surveillance video and confirmed the identity of Chaney.

24. Investigators observed Chaney return to the 3010 North 76th Street, Kansas City, Kansas residence in the Pontiac Grand Prix.  Chaney parked the vehicle outside of the residence and

8

then entered the home.  Chaney left the residence a short time later and law enforcement continued surveillance.

25. Detective Nicholson reviewed Truity Credit Union surveillance video from the day before the robbery (recorded on September 20, 2021).  Detective Nicholson located the Pontiac Grand Prix driving along the access road, directly to the south of the parking lot entrance/exit to the Truity Credit Union on that day.  Upon further review of the September 20, 2021 video surveillance, Detective Nicholson noticed a subject, wearing dark clothing and shoes consistent to the Safari print Nike Foamposites, walking through the Truity Credit Union parking lot.  The subject's build also appeared consistent with Chaney's physical descriptors.

26. On September 28, 2021, the Honorable James P. O'Hara, Chief United States Magistrate for the District of Kansas, granted search warrants for 3010 North 76th Street, Kansas City, Kansas and the 2004 Pontiac Grand Prix, bearing Kansas license plate 171 NPE.

27. On September 28, 2021, at approximately 6:30 p.m., FBI law enforcement personnel executed the search warrants.  At the time of the search warrants' execution, investigators contacted Davonte Laron Chaney in his 2004 Pontiac Grand Prix.  Law enforcement secured the vehicle and the residence at 3010 North 76th Street, Kansas City, Kansas.

28. Chaney agreed to speak with law enforcement and was transported to FBI Headquarters, located at 1300 Summit Street, Kansas City, Missouri for an interview.  FBI Task Force Officer (TFO) Patrick Salmon (Salmon) and Affiant conducted the interview with Chaney.  After investigators provided Chaney with his *Miranda* warnings, Chaney waived his rights and agreed to speak with investigators.

29. Chaney confirmed he resided at 3010 North 76th Street, Kansas City, Kansas with his current girlfriend, Ashleigh Downs, and their young son.  Chaney said he often visits Lawrence,

Kansas and is familiar with the area.  Chaney had previously resided in Lawrence, Kansas while attending the University of Kansas.  Danielle Vaughn, the mother of Chaney's three-year-old son, currently resides in Lawrence with their son.  Chaney has shared custody of their child and often picks up his son in Lawrence.

30. Chaney confirmed ownership of the 2004 Pontiac Grand Prix and said he is the primary driver. Chaney said when he traveled to Lawrence, he was the sole driver and no one else would have operated the Grand Prix at the time.

31. Chaney said he was in Lawrence, Kansas on the day of the credit union robbery (September 21, 2021), but had no knowledge of it.  Chaney said he did not arrive in Lawrence until the afternoon hours on September 21, 2021.  Chaney said he went to the Lawrence Humane Shelter to adopt a puppy, but prior to the adoption, he had not traveled to Lawrence for several days.

32. Chaney was asked if he owned any firearms.  Chaney reported his current girlfriend, Ashleigh Downs, owns a Glock model 43X 9mm handgun.  Chaney said the firearm is kept in the residence at 3010 North 76th Street, Kansas City, Kansas, but he does not associate with the firearm.  Chaney later said he handled the firearm, but only to move it to a safe location away from his son.

33. While speaking with Chaney, FBI Evidence Response Team (ERT) members (conducting the search of the residence at the 3010 North 76th Street, Kansas City, Kansas) informed your Affiant that a black Glock 9mm handgun, Model 43X, with serial number BRSH795, was recovered from the residence.  The seized firearm appears to match the make and style of the firearm in the September 21, 2021 Truity Credit Union surveillance video.



34. Your Affiant learned the FBI Emergency Response Team (ERT) located all six (6) bait bills (United States Currency) taken in the Truity Credit Union robbery.  The bait bills recovered from Chaney's residence were identified by serial numbers as the following: MJ00637731A ($20.00),   JJ29329861B   ($20.00),   JL01474882C   ($20.00),   JD13671739D   ($20.00), ML16336311B ($20.00), and ML16336313B ($20.00).  The bait bills were recovered from a safe located in the residence.



35. Chaney said he had two safes inside his residence that belong to him.  Chaney advised he is the only person who has access to the safes.  Chaney has one safe for important documents and another to store his money.  Chaney said he had approximately $2,000 dollars (U.S. Currency) in his safe.  When asked about the bait bills, Chaney could not provide an explanation how the bait bills ended up inside his safe.  Affiant later learned from the FBI Evidence Response Team that a third safe was located in the residence.

36. Chaney was asked about the two cellular phones he had in his possession at the time he was contacted by investigations.  These two cellular telephones are described as: 1) a black Apple iPhone Pro Max with a gray case, IMEI: 35285211250679, Telephone Number: (816) 778-5233; and 2) a red Apple iPhone 11, IMEI: 352910116703590, Telephone Number, (913) 284-4979.  Chaney said both cellular telephones belonged to him.  Chaney said the service provider for both cellular telephones is AT&T Wireless.  Chaney said he used the black Apple iPhone Pro Max for family and personal use.  Chaney explained the red Apple iPhone 11 is associated with a telephone number he has had for a long time.  Chaney said he would have had both

phones on his person during his travel to Lawrence, Kansas the week the bank robbery had occurred.  Investigators inquired about written consent for both cell phone and explained the consent/forensic examination process to Chaney.  Chaney provided investigators with written consent to conduct a forensic examination of both cellular telephones.  Chaney also provided investigators with the passcode [032512] for both cellular telephones.

37. On September 29, 2021, Affiant transferred custody of the cellular telephones to Lawrence, Kansas Police Department Detective Nicholson for further forensic examination.  Detective Nicholson informed Affiant the current forensic examination tools did not support the Apple iOS software currently installed on Chaney's Apple iPhones.  On December 15, 2021, at the conclusion of a detention review hearing before the Honorable Holly L. Teeter (Case No. 21-20059-01-HLT), Chaney's counsel informed the Court that Mr. Chaney had revoked consent to search the aforementioned cellular telephones. As of December 17, 2021, the cellular telephones remain in custody of the Lawrence, Kansas Police Department (5100 Overland Drive Lawrence, Kansas) pending the application of a search warrant.

38. On December 3, 2021, Affiant was informed the software capability (Applogic v2.2.1), to complete the forensic cell phone examination currently supported on Chaney's cellular telephones (iOS 15/15.1/15.1.1), would be available on December 10, 2021 and thereafter.

## CONCLUSION

39. Based upon the aforementioned facts, I believe a search of the following two cellular telephones: 1) a black Apple iPhone Pro Max with a gray case, IMEI: 35285211250679, Telephone Number, (816) 778-5233, Password: 032512; and 2) a red Apple iPhone 11, IMEI: 352910116703590, Telephone Number, (913) 284-4979, Password: 032512, seized from Davonte L. Chaney's person by law enforcement on September 28, 2021, will lead to evidence,

fruits, and instrumentalities related to violations of Title 18, United States Code, Sections 2113(a) and (d) [Bank Robbery] and Title 18, United States Code, Section 924(c)(1)(A)(ii) [Use of a Firearm in Furtherance of a Crime of Violence].

40. I hereby request the Court's permission to conduct a full and complete forensic phone examination of the two aforementioned cellular telephones, which are currently in custody of the Lawrence, Kansas Police Department, within the District of Kansas, at the signing of the search warrant.  The requested examination includes a search of photographs, e-mails, "address books" or "contacts" lists, call logs, audio files, calendars, stored image and video files, internet history, location data, and SMS and MMS text messages related to the bank robbery of the Truity Credit Union.

41. Based on Affiant's training and experience as a Lawrence, Kansas Police Detective and FBI Task Force Officer, and after conducting numerous robbery investigations, Affiant knows robbery suspect(s) often conduct searches on cellular telephones for pre-planning strategies or intelligence information, to include the searches of the internet, and various social media platforms and/or cell phone applications.  Affiant also knows that after a robbery is committed, suspects will conduct searches of the internet, and various social media platforms and/or cell phone applications, to retrieve information pertaining to the robbery the subject(s) committed to further gain intelligence information to the knowledge of Law Enforcement or other evidentiary information.

**TECHNICAL TERMS**

42. Based on my training and experience, your Affiant uses the following technical terms to convey the following meanings:

14

43. Wireless/cellular telephone: A wireless telephone (or mobile phone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books" or "contacts" lists; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

44. Geotagging: Geotagging is a feature that geographically tags the location and time of a photograph taken. The data saved at the time the image is captured is usually placed in a JPEG file using the exchangeable image file format (EXIF). The metadata within the EXIF is then readable by numerous photo editing software programs. Simply defined, metadata contains data that describe a file. In the case of EXIF metadata, it is data that describes data used by digital cameras, digital imaging software, and others to describe the particular attributes of a digital image file. The tagging information is added to photographs or video at the time it is taken if the geotagging tool is enabled in the camera settings. Programs such as Google Maps can be used to track the location a photograph or video was taken using the metadata encoded in photograph or video.

45. SIM card: SIM cards, or Subscriber Identity Module cards, or Subscriber Identification Modules, are plastic cards that have an embedded circuit on them that stores personal information of the account holder, including his or her phone number, address book, text messages and other data. A SIM card user can easily change cellular phone handsets by simply removing the SIM card from one handset and placing it in another compatible handset. In addition to the SIM card's ability to identify the cell phone user's phone number, contacts list, and text messages, the SIM card stores information used by the wireless carrier to identify the subscriber.

46. SD Cards: SD cards are a type of storage medium that come in various sizes. Some wireless telephones contain removable SD cards, on which the phone can store data, including but not limited to pictures, video, audio recordings, and contact lists.

47. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

48. GPS: A GPS navigation device uses Global Positioning System to display its current location. It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System

consists of multiple satellites orbiting the earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

49. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touchscreen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

50. IP Address: An Internet Protocol address (or simple "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers

control a range of IP addresses.  Some computers have static—that is, long term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

51. Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

52. Digital camera/SD Card/Memory Stick:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards, SD cards, memory sticks, or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

53. Based on my training, experience, and research, I know that the listed cellular telephones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

54. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet

are typically stored for some time on the device.  This information can sometimes be recovered with forensics tools.

55. There is probable cause to believe that things that were once stored on the device may still be stored there, for at least the following reasons:

56. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

57. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space— that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

58. *Forensic evidence.* This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the listed cellular telephones were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the listed cellular telephones because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging

systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the listed cellular telephones consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

60. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

61. I hereby request the Court's permission to conduct a full and complete forensic phone examination for all records, data, and information on the listed cellular telephones and SIM cards described in the affidavit which relate to violations of Title 18, United States Code, Sections 2113(a) and (d) [Bank Robbery] and Title 18, United States Code, Section 924(c)(1)(A)(ii) [Use of a Firearm in Furtherance of a Crime of Violence] and probable cause exists to believe the information and items listed herein will be found secreted in the listed cellular telephones, including:

a.   Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages;

b.   Device ownership and user information, including evidence of user attribution showing who used or owned the Device at the time the things described in the warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    c.    Photographs, images, and videos pertaining to bank robbery and firearm use and possession in connection with such; including stored information related to the date, time, user and owner of the device, and location of the image generation;

    d.    Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool. Including any identification information related to the use and ownership of the devices.

    e.    To include any and all searches of the internet or internet search history. Any and all searches of social media platforms and/or cell phone applications pertaining to any robberies to include commercial business robberies, and bank robberies.

62. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

The foregoing is true and correct to the best of my knowledge and belief.

RYAN PADILLA
Task Force Officer
Federal Bureau of Investigation

Sworn and attested by affiant via telephone, after being submitted to me by reliable electronic means, on this 20th day of December 2021.

HONORABLE TERESA J. JAMES
Chief United States Magistrate Judge
District of Kansas

22